**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 22 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNTIED STATES OF AMERICA,

    Plaintiff/Appellee,

v.

ALBERTO ZAMBRANO,

    Defendant/Appellant.

No. 02-2173
(New Mexico)
(D.Ct. No. CR 01-1398 BRB/JC)

---

**ORDER AND JUDGMENT**[*]

---

Terri J. Abernathy, Assistant U.S. Attorney (David C. Iglesias, United States Attorney with her on the brief), Las Cruces, New Mexico, for Plaintiff/Appellee.

James W. Klipstine, Jr. of James W. Klipstine, Jr., L.L.C., Hobbs, New Mexico, for Defendant/Appellant.

---

Before **LUCERO**, **O'BRIEN**, and **TYMKOVICH**, Circuit Judges.

---

    Mr. Alberto Zambrano was stopped by Border Patrol Agent David Collier

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

while driving on New Mexico Highway 54, approximately seventy miles north of the Paso Del Norte Port of Entry in El, Paso, Texas. Six kilograms of cocaine were found wrapped in bundles inside the gas tank of his black Mercury Cougar. He was charged with possession with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). Mr. Zambrano moved to suppress the cocaine, arguing Agent Collier did not have reasonable suspicion to stop his vehicle as required by the Fourth Amendment. The district court denied the motion in a comprehensive and thoughtful decision from the bench. The judge made factual findings and pointed to several particular facts which, collectively, supplied the requisite reasonable articulable suspicion for the stop. Thereafter, Mr. Zambrano entered a guilty plea, specifically reserving his right to appeal the denial of his motion to suppress. Our jurisdiction to review his timely appeal arises pursuant to 28 U.S.C. § 1291.

Reasonableness under the Fourth Amendment is a conclusion of law triggering a de novo review. *United States v. Gandara-Salinas*, 327 F.3d 1127, 1129 (10th Cir. 2003). On review, evidence is considered in the light most favorable to the prevailing party, and the district court's findings of fact are accepted unless clearly erroneous. *Id.* Our independent review of the record prompts us to observe that the traffic stop in this case was marginal, surviving largely because of our deference to the trial court's fact finding. Given the facts

found, including credibility determinations, the stop was reasonable and we affirm the district court's denial of the motion to suppress.

The Fourth Amendment protects against unreasonable searches and seizures by the government, including protections from unjustified investigatory stops of persons and vehicles. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). A border patrol investigatory stop is justified and will not offend the Fourth Amendment if it is supported by reasonable suspicion that criminal activity may be afoot. *Id.* A detaining officer must have a particularized and objective basis for suspecting legal wrongdoing. *Id.* "Border patrol agents may thus stop vehicles if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion." *Gandara-Salinas*, 327 F.3d at 1129. (citations and quotations omitted). Significantly, the calculus of reasonable suspicion must take into account the totality of the circumstances because the legal concept is "somewhat abstract." *Arvizu*, 534 U.S. at 274.

At the forefront of our discussion, we acknowledge the linchpin of Mr. Zambrano's argument. Our cases recognize that a person's reaction to the presence of law enforcement officers can legitimately trigger suspicion.[1] Agent

---

[1]The following factors are relevant in determining whether an immigration stop is supported by reasonable suspicion:
    (1) characteristics of the area in which the vehicle is encountered; (2) the

Collier described Mr. Zambrano's behavior as consistent with a driver who recognized him as a member of the law enforcement community. But, Mr. Zambrano testified that he did not realize he was being followed by a law enforcement agent, and therefore, his reactions, if any, observed by the agent were innocent. Without knowledge that he was being watched by a border patrol agent, he argues there can be no reasonable suspicion based upon reactive behavior, and the stop was consequently illegal.

In assessing the totality of the circumstances, the district court succinctly described the factual mosaic supporting the agent's suspicions and justifying the traffic stop. Recognizing first that law enforcement must "have more than a hunch" to instigate an investigatory stop, the court minimized the weight given to

proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) **the driver's behavior, including any obvious attempts to evade officers;** (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded.

*United States v. Gandara-Salinas*, 327 F.3d 1127, 1129-30 (10th Cir. 2003) (emphasis added).

Further, when occupants of the car "exhibit 'surprised or scared' facial expressions, widen their eyes, look back to watch the Border Patrol vehicle go by, return to looking straight forward with both hands gripping the steering wheel, look a second time, and then stare straight forward again," we have found such behavior to support a finding of reasonable suspicion. *United States v. Barron-Cabrera*, 119 F.3d 1454, 1457-58 (10th Cir. 1997).

the agent's testimony that Mr. Zambrano looked "very carefully" at the agent's vehicle when the two cars first passed each other going in opposite directions on the two-lane highway. (Transcript from Motion Hearing at 108). While this may have piqued the agent's interest and caused the agent to turn and follow the black Mercury, we agree with the district court that, standing alone, Mr. Zambrano's initial glance at the agent's vehicle was not enough to justify a traffic stop. But there is more.

After turning around and catching up with Mr. Zambrano's vehicle, the agent proceeded to follow closely behind and noticed several things indicative of a driver who was aware of the presence of law enforcement. The agent testified that Mr. Zambrano was driving ten miles per hour below the posted speed limit. He appeared nervous, looking at the agent's car several times in the rear view mirror, and when the agent moved into oncoming traffic to pass the Mercury, Mr. Zambrano did not turn to look, but appeared to be gripping the steering wheel tightly. After passing Mr. Zambrano's car, it became apparent to the agent that the Mercury was slowly drifting farther behind. The agent pulled to the side of the road, stopped, waited for Mr. Zambrano to pass in front of him, and then initiated the investigatory stop. Even if we assume, contrary to his testimony[2],

_____

[2] Mr Zambrano devotes a great deal of his argument to the idea that his reactions to the agent's vehicle — whether it be looking at the officer, not looking at the officer, gripping the steering wheel, slowing down, or speeding up

that Mr. Zambrano actually recognized the agent's unmarked vehicle to be that of law enforcement, it is still an uncomfortable stretch to believe the agent possessed "a particularized and objective basis for suspecting legal wrongdoing" based only on Mr. Zambrano's behavior.[3] *Arvizu*, 534 U.S. at 273. But, again, there is more.

Most noteworthy to the district court, and we agree, are the reasonable inferences the agent drew based on his knowledge of the circumstances and

---

— are irrelevant to the determination of reasonable suspicion. Mr. Zambrano testified that he had no idea the agent's unmarked Jeep Cherokee represented law enforcement. Furthermore, he argues, such knowledge could not be reasonably attributed to him based upon objective analysis of fact. Therefore, the argument continues, because he did not sense the presence of law enforcement, any action or reaction to the agent and his unmarked vehicle must be construed as innocent rather than suspicious behavior.

That said, it is fairly debatable whether Mr. Zambrano recognized the agent as law enforcement — the agent's Jeep had two lights mounted on the front bumper, two lights mounted on the back window, government license plates, a mounted wire K-9 kennel in the back of the vehicle, and the agent was in uniform — it is peripheral to our holding. Even if we assume he did not know the Jeep was occupied by a border patrol agent, the agent's reasonable suspicion of criminal activity was rooted in and justified by the totality of the circumstances, only part of which was Mr. Zambrano's behavior.

[3] Mr. Zambrano complains that "reactive behavior" can be described so broadly as to be meaningless. His complaints have some resonance. Indeed, the behavior descriptions sometime appear contradictory from case to case. An officer's suspicion is aroused: when a subject looks at him carefully or refuses to look at him; when a subject drives exactly at the speed limit or drives too slowly; when a subject appears too nervous or too nonchalant. But we recognize the dynamic that well trained and experienced officers bring to the process, and hence, require that their suspicions be reasonable and articulable, not necessarily universal or profound. And, we rely in large measure on the trial judge to separate the sincere from the contrived.

experience as a border patrol agent in southern New Mexico.[4]  In particular, while

following Mr. Zambrano, the agent requested a vehicle registration check on the

Mercury's license plate.  Although the car had not been reported stolen, a lane

crossing check,[5] provided by United States Customs, revealed the Mercury had

crossed the international border from Mexico to the United States approximately

---

[4]Important to the district court's decision, and likewise to ours, is its express finding that Agent Collier's testimony was "very credible . . . .  He was very frank in responding to the questions of both the government's counsel and to defense counsel . . . ."  (Transcript of Motion Hearing at 107).  "We give deference to the trial court in determining the credibility of witnesses." *United States v. Knapp*, 1 F.3d 1026, 1029 (10th Cir. 1993)

[5]A lane crossing records check informs the requesting agent whether a vehicle has crossed the international border within the previous seventy-two hours.  The requesting agent provides a license plate number and that number is queried in the Treasury Enforcement Communications System (TECS) database.  Agent Collier called in the Mercury's Colorado license plate, 248 ESG, and received a positive lane crossing result from the dispatcher.  Mr. Zambrano attempts to discount the lane crossing report by pointing out that the certified report from the TECS, obtained months after the investigatory stop, showed a vehicle with a New Mexico, not Colorado, license plate 248 ESG had crossed the international border.  Because of this discrepancy, Mr. Zambrano argues the results of the lane crossing check cannot be considered legitimate criteria in the agent's assessment of reasonable suspicion.  We disagree.  "A mistaken premise can furnish grounds for a . . . stop, if the officers do not know that it is mistaken and are reasonable in acting upon it." *United States v. Shareef*, 100 F.3d 1491, 1505 (10th Cir. 1996) (citations and quotations omitted).  There is no evidence that Agent Collier had reason to believe the information was erroneous, and as such, the positive lane check information is given due regard in the calculus of reasonable suspicion.

Additionally, the government notes that it is likely Mr. Zambrano's black Mercury, with Colorado license plates, is the vehicle that crossed the border, but the license plate was mistakenly recorded as a New Mexico plate. It points out that no New Mexico license plate "248 ESG" exists, suggesting a clerical error of no significance.

-7-

an hour and a half earlier. The agent also learned the vehicle had not been sent to the secondary inspection area at the port of entry, which indicated it had not been searched when it crossed the border. Significantly, both to us and to the district court, the border patrol checkpoint on this particular highway was closed due to construction. From his experience, the agent knew drug cartels from the El Paso area were moving narcotics on this highway, taking advantage of the closed checkpoint.[6]

Many of the factors in this case are markedly similar to those noted as apposite in *Gandara-Salinas*, 327 F.3d 1127. In addition to "reactive behavior" and other agent specific observations and inferences *Gandara-Salinas* accepted environmental factors as significant in the reasonable suspicion equation, *viz*., a recent border crossing (in that case, the previous day; here, less than two hours), a stretch of road notorious as a drug corridor, the temporary closure of a fixed border checkpoint, and reliable information that drug and alien smugglers closely monitor and exploit checkpoint closures. *Id*. at 1131.

The agent specific observations, while marginal, must be considered in combination with environmental factors. The cumulative impact of disparate

---

[6] The agent testified that the driver of a smuggling load had recently told another agent that the drug cartels in El Paso, Texas were using Highway 54 because the checkpoint was closed. (Applee's Supp. App. at 44). Additionally, twenty-three narcotic seizures, eight of which were made by Agent Collier, occurred in the two-month period the checkpoint was closed. (Id. at 42-43).

facts viewed from a global perspective permit Agent Collier to have reasonably inferred that Mr. Zambrano had just entered the United States from Mexico, had not been subject to search at the border, and had chosen to travel on this particular highway — known as a corridor for drug smuggling — in an attempt to circumvent the closed checkpoint.

Giving due weight to the factual inferences drawn by the agent, including Mr. Zambrano's reactions, or lack thereof, to the agent's presence,[7] and crediting the district court's comprehensive and logical findings, we hold that Agent Collier had a reasonable and articulable suspicion to believe Mr. Zambrano was engaged in illegal activity.

We AFFIRM the district court's denial of the motion to suppress.

**Entered by the Court:**


**TERRENCE L. O'BRIEN**

United States Circuit Judge

---

[7] Again, even if Mr. Zambrano did not recognize the presence of law enforcement, and if his behavior toward the agent was innocent, "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277. His reactions, taken together with all other reasonable inferences drawn by the agent, suffice to form a particularized and objective basis for the stop.